In re Thomas F. MORGAN, Debtor.

Jack CORMAN, Plaintiff/Appellant,

v.

Thomas F. MORGAN,
Defendant/Appellee.

No. C–96–0527–VRW.

United States District Court,
N.D. California.

June 17, 1996.

Roger F. Claxton, Dallas, TX, Randall C. Bupp, Kornfield Paul & Bupp, Oakland, CA, for Jack Corman.

Molly J. Baier, Oakland, CA, for Thomas F. Morgan.

## ORDER

WALKER, District Judge.

The business dealings between the appellant, Jack Corman, and the debtor/appellee, Thomas Morgan, began in 1988 when Corman leased a tract of real property in Texas to Gulf Coast Restaurant Corporation. Morgan was a principal of Gulf Coast and personally guaranteed Gulf Coast's obligations under the lease. Gulf Coast eventually defaulted, and in 1990 Corman sued Morgan in Texas state court on the guaranty agreement. Both parties refer to this suit as the "first Texas action."

While the first Texas action was pending, Morgan filed his petition in bankruptcy. The automatic stay was lifted to allow the first Texas action to proceed. On February 11, 1993, Morgan and Corman met at the taking of Morgan's deposition. They discussed settlement. During the course of this discus-

sion, Morgan allegedly explained that his financial condition was bleak and that he had only two assets: (1) an undivided interest in real property in Chico, California and (2) a secured promissory note with an original principal amount of $210,000. Morgan offered Corman his choice of one of these assets as settlement of the first Texas action. Corman chose the promissory note.

The promissory note had been executed by National Dental Association, Inc.; the parties refer to it as the "NDA note." Morgan allegedly represented that the note had an original principal amount of $210,000, that it had an annual interest rate of twelve percent and that the payments were of interest only until maturity in 1997. Morgan allegedly said that NDA had always paid on time, that the note was current and that it was secured by a substantial amount of restaurant equipment located at a Yuba City, California Sizzler restaurant. Morgan allegedly failed to inform Corman that this security interest in the restaurant equipment was a subordinate interest.

Corman claims that, unknown to him, Morgan's retirement trust, Cal–State Development Co Employees Retirement Plan Trust, held a prior perfected security interest in the restaurant equipment at the time the February 11, 1993, settlement of the first Texas action was reached. The history of the liens on the Yuba City equipment is as follows:

In July 1991, Nor Cal Dining, Inc. and Cal–State entered into a master equipment lease which covered the Yuba City equipment. On July 10, 1991, Cal–State filed a UCC–1 in California which covered this equipment. It is this security interest which Corman now claims Morgan concealed during the February 11, 1993, settlement discussions.

On August 10, 1992, the master equipment lease was assigned by Nor Cal to NDA. Corman claims that this assignment was not placed on the record. In a separate and unrelated transaction, Morgan sold NDA other property, in exchange for which NDA executed and delivered to Morgan the NDA note; NDA secured this note by giving Morgan a security interest in the Yuba City equipment. By August 1992 there were

three liens on the Yuba City equipment: one granted by Nor Cal to Cal–State in 1991; one granted by NDA to Cal–State in 1992; and one granted by NDA to Morgan in 1992.

Corman now claims that he was not on notice of the 1991 Cal–State lien at the time Morgan's plan was confirmed. Corman claims that his UCC search of the NDA note did not turn up any superior security interests in the Yuba City equipment. Corman further argues that since the transfer of the master equipment lease from Nor Cal to NDA was unrecorded, he had no way of knowing that he should have searched the names "Nor Cal" or "Cal–State" when he was searching for prior liens on the Yuba City equipment.

The settlement of the first Texas action, which was reached in principle on February 11, 1993, was made a part of Morgan's reorganization plan. That plan was confirmed by the bankruptcy court on December 16, 1993.

NDA filed for bankruptcy in 1994. In the course of that bankruptcy the existence of the 1991 Cal–State/Nor Cal lien on the Yuba City equipment came to light. The Cal–State lien was given priority over the lien held by Corman; since the value of the equipment was less than the amount owed Cal–State under the Master Equipment Lease, Corman turned out to be completely unsecured on the NDA note. Corman subsequently filed a fraud action against Morgan in Texas state court, referred to by the parties as the "pending Texas action." In the pending Texas action, Corman accuses Morgan of defrauding him in the February 11, 1993, settlement by failing to disclose the existence of the 1991 Cal–State/Nor Cal lien. Corman claims that Morgan must have known of the existence of the 1991 Cal–State/Nor Cal lien because Morgan is Cal–State: he is its sole trustee and beneficiary.

Shortly after Corman filed the pending Texas action, Morgan successfully moved in Texas state court to abate the case. Morgan then filed an adversary proceeding in the Northern District bankruptcy court, which had adjudicated his bankruptcy and which had retained jurisdiction over the execution of the plan and the discharge. Morgan re-

quested from the bankruptcy court a declaration that Corman's fraud cause of action was discharged in Morgan's bankruptcy, arguing (1) Corman's claim "arose" before confirmation of Morgan's reorganization plan and is therefore discharged and (2) Bankruptcy code § 1144 (revocation of confirmation) provides Corman's exclusive remedy. On December 18, 1995, Bankruptcy Judge Jellen granted Morgan's motion for summary judgment and denied Corman's cross-motion, ruling that Corman's fraud cause of action was discharged on December 16, 1993, when Morgan's reorganization plan was confirmed. Judge Jellen also held that the pending Texas action was barred by Morgan's discharge.

In so holding, the bankruptcy court first found that Corman's fraud claim against Morgan arose when Morgan allegedly lied to Corman. Alternatively, the bankruptcy court held that Corman's fraud claim arose during the negotiations which finalized the February 11, 1993, settlement, because at this time Corman should have "fairly contemplated" the possibility of a fraud claim against Morgan. The bankruptcy court also suggested, but apparently did not rule, that the pending Texas action was barred by FRCP 60(b) and/or 11 U.S.C. § 1144.

Corman has appealed and designated the following two questions for review:

1. Did the bankruptcy court err in ruling that Corman's fraud claim against Morgan arose when Morgan—before confirmation of his chapter 11 reorganization plan—made the allegedly false representation and that Corman's fraud claim has therefore been discharged by that confirmation?

2. Did the bankruptcy court err in ruling that Corman's fraud claim did not arise when the falsity of the misrepresentation was discovered?

For the reasons stated below, the court concludes that bankruptcy court did not err in granting Morgan's motion and AFFIRMS the decision of the bankruptcy court.

I

The bankruptcy court adversary hearing regarding the discharge of Corman's fraud claim was a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). The bankruptcy court was empowered to enter a final judgment on this issue, and the standard of review to be applied in the current appeal is identical to the standard used by circuit courts of appeal reviewing district court decisions: clearly erroneous review of factual findings and de novo review of legal conclusions. See FRBankrP 8013; *In re Diversified Contract Services, Inc.*, 158 B.R. 169, 171 (N.D.Cal.1993). Since granting summary judgment is a question of law, the court must review the bankruptcy court's ruling de novo.

II

Upon confirmation of a reorganization plan, § 1141 of the Bankruptcy Code provides:

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any such debt that arose before the date of such confirmation * * * whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan.

The Code defines a "claim" as follows:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

The first issue raised by Corman is whether federal or state law should determine when his fraud cause of action arose against

Morgan. Corman argues that since a fraud cause of action is a creature of state law, state law should determine when it comes into existence. Corman cites *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946) for support, focusing particularly on its language that "what claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law."

■■ Corman's argument that state law should control, while sensible, is unavailing. The Ninth Circuit has strongly suggested that the determination of when a claim arises for bankruptcy purposes is a matter of bankruptcy law:

> The determination of when a claim arises for purposes of bankruptcy law should be a matter of federal bankruptcy law and should not be governed by the particular state or nonCode federal law giving rise to the claim. The reason for this is that the Code definition of "claim" expressly includes rights to payment or equitable relief that are unmatured or unliquidated. Most state or nonCode federal statutes are only concerned with claims that have been liquidated.

*In re Jensen,* 995 F.2d 925, 930 n. 5 (9th Cir.1993) (quoting Arlene Elgart Mirsky et al., *The Interface Between Bankruptcy and Environmental Laws,* 46 Bus.Law. 626, 651 (1991)). While dictum, there is no reason to suspect that the Ninth Circuit, if presented squarely with the question of which law governs when a claim arises for purposes of bankruptcy law—and in particular for purposes of § 1141(d)(1)(A)—would back away from the above language. As the *Jensen* court noted elsewhere, Congress purposefully gave "claim" a broad definition in the Code in order to further "the overriding goal of the Bankruptcy Code to provide a 'fresh start' for the debtor." *Jensen,* 995 F.2d at 928. Given this, it makes sense to determine when a claim arose for bankruptcy purposes solely by reference to bankruptcy law, since state law doctrines on when causes of action arise are usually founded on concerns raised by stale actions such as dead witnesses, the possibility of fraud, etc. These concerns are quite different from the Code's central concern of giving the debtor a "fresh start." The court will therefore apply federal law to the question of when Corman's fraud claim against Morgan arose.

### III

*In re Jensen* is the leading case in the Ninth Circuit on when a creditor's claim "arises" for the purpose of discharge. *Jensen* involved the personal bankruptcy of a husband and wife who owned JLC, a failed lumber business. 995 F.2d at 926. In January 1984, after JLC had already ceased operating, an inspector from the California Regional Water Quality Control Board visited the inactive site and noticed a large cinderblock tank which contained 5,000 gallons of lumber fungicide. Id. In a February 2, 1984, letter the Board inspector expressed his concern to Robert Jensen that a spill of the fungicide could cause massive environmental damage and requested prompt action to prevent such a mishap. Id. On February 10, 1984, Jensen's lawyer informed the Board that the Jensens had no money to dispose of the fungicide; on February 13, 1984, the Jensens filed a chapter 7 bankruptcy. Id.

In March 1984, the California DHS, at its own expense, removed the fungicide from JLC property. Id. at 926–27. On February 20, 1985, the Jensens' chapter 7 bankruptcy closed; no assets were distributed to creditors. Id. at 927.

In 1987, DHS notified the Jensens that it considered them responsible under CERCLA for roughly $90,000 spent during the cleanup at the JLC site. Id. In December 1988 the Jensens' chapter 7 proceedings were reopened to allow them to list the DHS as a creditor of the chapter 7 estate; in April 1989, they filed an adversary proceeding in the chapter 7 case and sought a declaration that the DHS claim had been discharged. Id.

The BAP eventually agreed with the Jensens and held that "because * * * claims in bankruptcy arise based upon the debtor's conduct, * * * DHS's claim arose in this case pre-petition, and was therefore discharged in

the Jensens' bankruptcy." Id. The Ninth Circuit affirmed the BAP's conclusion but disagreed with its reasoning. It first noted that in order to determine when the DHS's CERCLA claim arose against the Jensens for bankruptcy purposes it had to reconcile the "conflicting objectives" of forcing responsible parties to pay for contamination under CERCLA, on the one hand, and giving debtors a fresh start under the bankruptcy laws, on the other. Id. at 928. It then reviewed various approaches which other courts had taken to determining when claims arise for bankruptcy purposes. Id.

The *Jensen* court considered three different approaches to determining when a claim "arises."[1] The most restrictive approach considered in *Jensen*—and the one urged in this case by Corman—is the so-called "right to payment" test, under which a claim does not arise for bankruptcy purposes until each element of the claim is established. This approach—which has been embraced most notably by the Third Circuit, see *In re M. Frenville Co.*, 744 F.2d 332 (3d Cir.1984)— was rejected by the *Jensen* court:

> To hold that a claim for contribution arises only when there is an enforceable right to payment appears to ignore the breadth of the statutory definition of "claim." In relevant part, a claim is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 USC § 101(5)(A). This "broadest possible definition" of "claim" is designed to ensure that "all legal obligations of the debtor, *no matter how remote or contingent,* will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Congr., 2d Sess. 1, 309 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6266 * * *.

> The breadth of the definition of "claim" is critical in effectuating the bankruptcy code's policy of giving the debtor a "fresh start." * * * *Frenville*'s "right to payment" theory is widely criticized outside

the Third Circuit, * * * at least in part because it would appear to excise "contingent" and "unmatured" claims from § 101(5)(A)'s list.

*Jensen,* 995 F.2d at 927–28 (emphasis in original).

At the other extreme of the approaches considered in *Jensen*—and the one urged in this case by Morgan—is the "debtor's conduct" approach adopted by the *Jensen* BAP. Under this approach, a claim arises "upon conduct by the debtor which would give rise to a cause of action, if other elements may later be satisfied." *In re Jensen,* 127 B.R. 27, 32 (9th Cir. BAP 1991). Using this approach, bankruptcy courts have concluded that a tort claim "arises" when the tortious conduct occurs, even if the actual injury is not suffered until much later. See, for example, *In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986) (claim for asbestos injury arises at time of sale of asbestos containing materials, not when claim for injury is made); *In re A.H. Robins Co.,* 63 B.R. 986, 993 (Bankr.E.D.Va.1986) (claim for injury from Dalkon shield arises at time of shield insertion, not when shield causes injury); *In re Chateaugay Corp.,* ("LTV"), 112 B.R. 513, 522 (Bankr.S.D.N.Y.1990) (CERCLA claim arises at time of release or threatened release of a hazardous substance, not when claim becomes ripe for adjudication). Following this approach, the *Jensen* BAP concluded that the DHS's claim against the Jensens arose when discharge of the fungicide was first threatened, well before they filed their chapter 7 petition. *Jensen,* 127 B.R. at 33. The BAP therefore held DHS's CERCLA claim to be discharged, in spite of the fact that cleanup occurred post-petition. Id.

The Ninth Circuit held that the *Jensen* BAP's adoption of the "debtor's conduct" approach was inappropriate in the context of CERCLA claims:

> The debtor's conduct approach adopted by the BAP in this case is not immune from criticism, either. One commentator has noted that "[d]espite Congress's repeal of the 'provability' requirement and its

---

1. Actually, the *Jensen* court considered four approaches, but the fourth approach—the so-called "relationship" test—was treated as functionally identical to the "debtor's conduct" test and was rejected for the same reasons. 995 F.2d at 930.

broad definition of claim, nothing in the legislative history or the Code suggests that Congress intended to discharge a creditor's rights before the creditor knew or should have known that its rights existed." * * *

Moreover, discharging liability solely because a release of hazardous substances occurred pre-petition may conflict with CERCLA's goal of cleaning up the environment quickly. This drawback is, in a sense, the flipside of the "right to payment" approach, which ignores important bankruptcy concepts and objectives.

*Jensen*, 995 F.2d at 930.

In order to balance the sometimes competing goals of CERCLA and the Code, the *Jensen* court adopted the "fair contemplation" test, concluding that "claims" under the Code include "all future response and natural resource damages cost[s] based on pre-petition conduct that can fairly be contemplated by the parties at the time of debtors' bankruptcy." Id. Because the DHS knew that the pesticide was present on the Jensens' land at the time the Jensens filed bankruptcy, the court concluded that DHS's CERCLA claim could have been "fairly contemplated" prior to the bankruptcy and thus that it was a "claim" that had been discharged upon confirmation of the Jensens' chapter 7 plan. Id. at 931.

Since Corman is attempting to bring a fraud claim, not a CERCLA claim, *Jensen* does not directly apply to this case. Nonetheless, *Jensen*'s "fairly contemplated" test is the most appropriate of the above tests for determining when Corman's claim arose. As is the case with CERCLA claims, a creditor pursuing a fraud claim against a bankrupt presents a court with conflicting objectives.

On the one hand is the objective of giving the debtor a fresh start. Providing debtors this fresh start is the overriding goal of the Code. See *In re Bugna*, 33 F.3d 1054, 1059 (9th Cir.1994) ("the Code is designed to afford debtors a fresh start, and we interpret

liberally its provisions favoring debtors"). The objective of giving debtors a fresh start therefore supports adopting a very broad definition "claim" in this case, perhaps even to the extent of adopting the "debtor's conduct" approach which *Jensen* rejected in the CERCLA context.

On the other hand is the objective of not allowing debtors to use the Code as a shield for fraudulent conduct. One way in which this objective manifests itself is the judicial doctrine which limits discharge to innocent debtors. See, for example, *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (while the fresh start is "a centralized purpose of the Code," this opportunity is limited to the "honest but unfortunate debtor"); *Bugna*, 33 F.3d at 1059 (refusing to discharge punitive damages awarded for fraud because "Bugna and others who incur liability for punitive damages through the commission of fraud while acting in a fiduciary capacity are neither honest nor unfortunate, and they do not deserve the benefit of the fresh start policy"). Another way this objective manifests itself is Code §§ 523(a)(2) and (4), which except debts for fraud from discharge.[2]

■ Adoption of the "fairly contemplated" test is the best way to balance the Code's fresh start policy, on the one hand, and its measured hostility to fraud, on the other. On the one hand, adoption of this test will serve the goal of giving debtors a fresh start by forcing all creditors who know or should know before confirmation of their fraud claims against the debtor to bring those claims in the bankruptcy case, thus allowing those claims to be resolved under the Code's special provisions for fraud and discharge. On the other hand, adoption of this test will prevent bankruptcy from being used as a shield for fraud by allowing fraud claims to go forward against debtors who concealed their fraud prior to discharge. The court therefore concludes that Corman's claim for fraud arose pre-confirmation—and thus was

**2.** It is important to note, however, that the Code does offer a small amount of shelter to those who have committed fraud: debts for punitive or emotional damages assessed for fraud committed outside of a fiduciary relationship *are* dischargea-

ble. See, for example, *In re Pedrazzini*, 644 F.2d 756, 758 (9th Cir.1981) (noncompensatory fraud debts are nondischargeable only when a fiduciary relationship existed before the fraud).

discharged by the confirmation of Morgan's Chapter 11 plan—only if Corman should have "fairly contemplated" the existence of his claim before that confirmation.[3]

## IV

■ The record supports the bankruptcy court's conclusion that Corman should have "fairly contemplated" the existence of his fraud claim prior to the confirmation of Morgan's reorganization plan. In concluding that Morgan was entitled to summary judgment under the "fairly contemplated" test, the bankruptcy court found as follows: "The parties [Corman and Morgan] were negotiating for the purchase of an asset [during the negotiations settling the first Texas action]. Inquiries were made. The buyer was represented by counsel. They opted not to include anything about the security or nonexistence of security in the agreement. I think this—the facts here do meet the 'fair contemplation' test, if that's the law." Supp. Record, Ex A at 13:20–25. The fact that extensive negotiations occurred before the first Texas action was settled does help satisfy the "fair contemplation" test, because it tends to show that Corman contemplated the possibility of being defrauded in the settlement and took steps to prevent such fraud. Standing alone, however, the undisputed fact that the settlement of the first Texas action was the result of arms-length negotiations does not establish that Corman's fraud claim should have been "fairly contemplated" by him at the time Morgan's chapter 11 plan was confirmed.

The record also reflects that on September 8, 1992, Cal–State filed with the California Secretary of State a UCC–1 financing statement against NDA. See Request for Judicial Notice, Ex F. This financing statement purported to cover "Restaurant equipment located at Sizzler Restaurant, 872 Onstott Road, Yuba City, California, as more specifically set forth in the equipment schedule attached to the Master Equipment lease between Nor Cal Dining, Inc. and assigned to Debtor [NDA] herein, and Secured Party

[Cal–State]." Id, Ex G. Corman has admitted that he conducted a UCC search on the NDA note prior to plan confirmation, but claims that this search "did not reveal the existence of a previously filed financing statement." Corman Decl. at ¶ 4.

Corman's claim that he conducted a UCC search on the NDA note which came up empty notwithstanding, the presence of the Cal–State/NDA financing statement in the public record prior to confirmation was sufficient to put Corman on constructive notice of his fraud claim against Morgan. Corman has attempted to avoid this conclusion by arguing that it was the 1991 Cal–State/Nor Cal lien, not the 1992 Cal–State/NDA lien, which caused him to be unsecured in the NDA bankruptcy. Corman argues that constructive knowledge of the 1992 lien is therefore irrelevant to his current fraud claim.

While Corman is correct that the bankruptcy court in the NDA bankruptcy relied on the existence of the 1991 lien for its conclusion that Corman was an unsecured creditor, his argument is nonetheless unavailing. Even if the 1991 Cal–State/Nor Cal and the 1992 Cal–State/NDA liens differ in substance, the 1992 Cal–State/NDA lien at the very least put Corman on notice that a purportedly superior security interest in the Yuba City equipment existed. Moreover, the Cal–State/NDA lien mentions the name "Nor Cal." Prior to Morgan's confirmation, then, Corman was on notice (1) of a purportedly superior security interest in the Yuba City equipment and (2) that an entity named "Nor Cal" had previously leased this equipment from Cal–State, the secured party. Taken together, these facts created a duty in Morgan to search the public records under the name "Nor Cal" to determine whether any other purportedly superior security interests existed in the Yuba City equipment. Such a search would have disclosed the 1991 Cal–State/Nor Cal lien. Morgan, therefore, was on constructive notice of this lien.

Prior to the confirmation of Morgan's bankruptcy plan, Corman was on constructive notice of the existence of both the 1991

---

**3.** *Jensen* involved claims which arose pre-*petition,* whereas this case involves a claim which arose pre-*confirmation.* Corman, however, has

not challenged the bankruptcy court's conclusion that a claim which arises pre-confirmation is discharged.

Cal–State/Nor Cal lien and the 1992 Cal–State/NDA lien. It follows from this conclusion that Corman should have "fairly contemplated" the existence of his current fraud claim against Morgan before Morgan's chapter 11 plan was confirmed.

While the court reaches the above conclusion as a matter of federal bankruptcy law, analogous state law would reach the same result. See, for example, 3 Witkin Procedure § 454:

[for accrual of actions] the rule is that the plaintiff must plead and prove the facts showing: (a) Lack of knowledge. (b) Lack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date). (c) How and when he did actually discover the fraud or mistake. Under this rule constructive and presumed notice or knowledge are the equivalent of knowledge. *So, when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation (such as public records or corporation books), the statute commences to run*

(emphasis added); *Gaddis v. Smith*, 417 S.W.2d 577 (Tex.1967) ("a cause of action based on an actionable fraud accrues when the fraud is discovered or, by the exercise of reasonable diligence, should have been discovered").

Corman's claim against Morgan arose before the confirmation of Morgan's reorganization plan. The bankruptcy court therefore did not err in concluding that Corman's fraud claim was discharged by that confirmation and that the pending Texas action is barred by that discharge.

## V

Corman also argues that finding his present fraud claim discharged would violate the Fifth Amendment. Corman cites a string of cases for the proposition that due process prohibits discharging a creditor's claim when the creditor is not given notice of the bankruptcy proceedings. See, for example, *Reliable Electric Company, Inc. v. Olson Construction Company*, 726 F.2d 620 (10th Cir. 1984); *In re Intaco Puerto Rico, Inc.*, 494 F.2d 94 (1st Cir.1974); *In re Harbor Tank Storage Co.*, 385 F.2d 111 (3d Cir.1967). Corman also cites a case for the proposition that a creditor with notice of a proceeding but no knowledge of his claim against the bankrupt raises the same due process concerns as raised by a creditor who has knowledge of his claim but no notice of the proceedings. See *Acevedo v. Van Dorn Plastic Machinery Co.*, 68 B.R. 495, 499 (Bankr. E.D.N.Y.1986).

■ Even accepting the above legal propositions, Corman's due process argument is unavailing. Corman had constructive knowledge of his fraud claim at the time of Morgan's discharge. Given this, the bankruptcy court's conclusion that Corman's fraud claim was discharged by Morgan's chapter 11 confirmation is no more offensive to due process than would be a state court holding that Corman's claim was time-barred because he had constructive knowledge of the fraud outside of the limitations period. The bankruptcy court therefore did not err in rejecting Corman's Fifth Amendment argument.[4]

In sum, the bankruptcy court did not err when it concluded that Corman's fraud claim was discharged when Morgan's Chapter 11 plan was confirmed. The bankruptcy court's decision is AFFIRMED.

IT IS SO ORDERED.

---

4. Because the court concludes that Corman's fraud claim was discharged when Morgan's plan was confirmed, it has not considered Morgan's argument that the pending Texas action is barred by FRCP 60(b) or § 1144 of the Code.